UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE


**Helen Rena Lalime**


     **v.**                                        Case No. 08-cv-196-PB
                                                     Opinion No. 2009 DNH 053
**Michael Astrue, Commissioner**
**Social Security Administration**


## MEMORANDUM AND ORDER

Pursuant to 42 U.S.C. § 405(g), Helen Rena Lalime challenges the Commissioner of the Social Security Administration's (the "Commissioner") decision that she is not entitled to Social Security Disability Benefits under Title II of the Social Security Act.  Lalime argues that this court should either reverse the Commissioner's ruling or remand the case for further hearing.  For the reasons set forth below, I deny Lalime's request.


## I.  BACKGROUND

The background facts are set forth in much detail in the parties' joint statement of material facts (Doc. No. 9).  The following is a summary.

### A.  Lalime's Medical History

Plaintiff Helen Lalime, currently fifty years old, is a former liquor store cashier and stocker and airline baggage handler.  (Pl.'s Mot., Doc. No. 6-2, at 1.)  In late 2001, Lalime

suffered an injury to her right shoulder, which was later
diagnosed more precisely as a rotator cuff issue, while closing
an aircraft door at work.  On January 25, 2005, Dr. William
Mitchell, an orthopaedic surgeon, examined Lalime's right
shoulder, diagnosed symptomatic rotator cuff tear, and
recommended surgery.[1]  (Joint Statement of Facts, Doc. No. 9, at
1.)  An MRI of Lalime's right shoulder, dated February 26, 2005,
revealed tendinitis,[2] extensive edema[3] in the acromioclavicular
joint,[4] mild degenerative hypertrophic[5] change in the
acromioclavicular joint with caudal spurring[6] abutting the
superior aspect of the supraspinatus myoteninous junction region,

---

[1]  In January 2005, Lalime was forty-seven years old.

[2]  The parties have agreed to the appropriate definitions
for the various medical terms at issue.  This order adopts those
definitions.  Tendinitis is the "inflamation of tendons and of
tendon-muscle attachments."  (Joint Statement of Facts, Doc. No.
9, at 3 n.6 (quoting Dorland's Illustrated Medical Dictionary
1746 (30th ed. 2003)).

[3]  Edema is "the presence or [sic] abnormally large amounts
of fluid in the intercellular issue [sic] spaces of the body,
usually referring to demonstrable amounts in the subcutaneous
tissues."  (Id. at 4 n.7.)

[4]  "The acromioclavicular joint is the place of union or
junction between the acromion and the clavicle."  (Id. at 4 n.8.)

[5]  Hypertrophic means marked by hypertrophy, which is "the
enlargement or overgrowth of an organ or part due to an increase
in size of its constituent cells."  (Id. at 4 n. 9.)

[6]  A spur is "a spiked object or other type of goad."  (Id.
at 4 n. 10.)

and small joint effusion[7] and a small amount of fluid in the
subacromial-subdeltoid bursa.[8]  (Id. at 4.)

Lalime first underwent surgery for her shoulder on April 20,
2005, when Dr. Mitchell performed a glenhumeral debridement and
arthoscopic subacromial resection of Lalime's right rotator cuff.
(Pl.'s Mot., Doc. No. 6-2, at 1.)  Lalime followed a physical
therapy regiment, but in September 2005, "it was reported that
Plaintiff was making slow progress with function."  (Joint
Statement of Facts, Doc. No. 9, at 5.)  A physical exam revealed
persistent apprehension in extremes of motion, stable range, and
intact neurovascular functioning.  On January 24, 2006, Dr.
Mitchell noted persistent glenohumeral instability, and in March
2006, Lalime had arthrosporic capsulorrhaphy performed on her
right shoulder.  (Id.) In April 2006, Lalime had right shoulder
arthroscopy, and again underwent physical therapy shortly
thereafter.  (Id. at 6.)

The record contains a function report, dated March 29, 2006,
wherein Lalime detailed the tasks she completed in a typical day.
She reported that she watched television, read, prepared simple
meals, cared for her personal needs, surfed the internet, and

_____

   [7]  Effusion is "the escape of fluid into a part or tissue."
(Id. at 4 n.11.)

   [8]  A bursa is "a sac or saclike cavity filled with a viscid
fluid and situated at places in the tissues at which friction
would otherwise develop."  (Id. at 4 n.12.)

cared for her dog.  (Tr. at 135.)  She further stated, "I cannot
work because I have difficulty using my right shoulder due to
pain and weakness."  (Id.)  Lalime explained that because she is
right-hand dominant, she had learned to use her left arm when
performing necessary daily tasks.  She noted that she cleaned her
home once a week, but was required to take frequent breaks
because of shoulder pain.  (Joint Statement of Facts, Doc. No. 9,
at 8.)  Although Lalime reported that she had difficulty reaching
above her head, getting up from a squatting position, and using
her right arm to lift things, she "otherwise stated that she had
no difficulty walking, bending, standing, sitting, talking,
hearing, concentrating, understanding, following instructions, or
getting along with others."  (Id.)

    After Lalime filed an application for Disability Insurance
Benefits in February 2006, Hugh Fairley, a state agency
physician, reviewed Lalime's medical records and completed a
physical residual functional capacity ("RFC") assessment on May
30, 2006.  (Id.)  Dr. Fairley determined that Lalime had a right
shoulder rotator cuff tear, and he opined that she could "lift 20
pounds occasionally, lift 10 pounds frequently, stand and/or walk
for about six hours in an eight-hour workday, and sit for a total
of about six hours in an eight hour work day."  (Id.)  He also
opined that Lalime was limited in her ability to pull, push, and
reach with her upper right extremity, and that she was limited to

-4-

occasional climbing and frequent balancing, stooping, kneeling, and crawling.  Fairley recommended that Lalime avoid exposure to hazards, but concluded that she retained a light work capacity with upper extremity restrictions.  (Id.)

As of July 2006, Dr. Mitchell reported that Lalime had good mobility and intact neurologic status.  (Id. at 7.)  By the end of the year, he found that Lalime had made progress and was doing well in restoring motion, but her strength remained deficient. Lalime visited Dr. Mitchell on March 20, 2007.  He found the following:  "Persistent radiculopathy and pain in the shoulder despite stabilization with capsulorrhaphy.  Arc of motion restored to within 90 degrees without apprehension. Neurovascular status is intact.  Sensitivity on extremes of motion.  Mild apprehension against resistence testing. Apprehensive with strength testing above the horizontal plane." (Tr. at 311.)  At this point, Dr. Mitchell planned to restrict Lalime's work from activities requiring repetitive reaching, pushing, and pulling on a permanent basis.  He also recommended that she permanently restrict herself to lifting less than five pounds.  (Joint Statement of Facts, Doc. No. 9, at 7.) Obviously, this assessment differs from that reached by the agency physician on May 30, 2006.

Dr. Mitchell's final medical notation appearing in the record is from August 2007.  At that time, he opined that

Lalime's shoulder was "stable and functional" and that her
"cervical range of motion and shoulder and arm motion were full."
(Id. at 8.)  He also noted that Lalime had "good strength against
resistive testing," but also had "persistent pain and sensitivity
and limited function in the right arm."  (Id.)  Lalime reported
"pain radiating along upper right arm and forearm and pain with
arc of motion of her shoulder when engaging her neck."  (Id.)
Dr. Mitchell's notes indicate that his impression was cervical
radiculopathy and his plan was a spine consultation.  (Tr. at
312.)

   **B.**   **Administrative Procedural History**

       On February 17, 2006, Lalime filed an application for
Disability Insurance Benefits and a period of disability, citing
January 6, 2005, as the onset date.  (Joint Statement of Facts,
Doc. No. 9, at 1.)  That application was initially denied on June
5, 2006.  An administrative hearing was then held on August 21,
2007, before Administrative Law Judge ("ALJ") Robert S.
Klingebiel.  At the hearing, Lalime testified about her previous
employment, the pain and aching she felt in her right shoulder,
and the medications (namely, Hydrocodone and Ibuprofen) she was
taking at the time.  (Id. at 9.)  She noted that she sometimes
had difficulty sleeping through the night because of pain in her
shoulder, and that she was "able to sleep comfortably for about
six hours tops on an average night."  She explained her daily

-6-

routine, including, for example, how she could only use the
computer for approximately sixty to ninety minutes until her
shoulder started to hurt.  (Id. at 10.) She also explained how
she had learned to groom herself primarily using her left hand.

As for her daily household chores, Lalime explained that she
vacuumed using her left hand, washed dishes before they
accumulated, and used her left arm to pull items, like milk, out
of the refrigerator.  She did light grocery shopping; however,
when she purchased several items, she would bring a friend along
with her to help carry the bags.  Finally, Lalime testified that
she felt pain when she reached "up high and across," but that she
could reach to shoulder height without issue.  She explained that
she might be able to lift up to twenty pounds, but afterward
would feel pain, and that she could not lift ten pounds
repetitiously.  (Id. at 10-11).  Finally, she told the ALJ that
she could stand, sit, and walk for up to six hours in an eight-
hour workday, and that she was not able to reach above her
shoulder with her right arm.

A vocational expert classified the exertional level of
Lalime's work stocking shelves in the liquor store as medium
unskilled work and her job as a baggage handler as heavy
unskilled work.  (Id. at 11.)  The ALJ and Lalime's counsel then
each posed a hypothetical question to the expert, asking the
expert to list any jobs that would be suitable for a person under

-7-

the restrictions explained in the hypothetical.

For his question, the ALJ asked what work would be available to an individual with Lalime's vocational background and who could lift a maximum of twenty pounds on occasion (not solely with the dominant arm and hand) and lift ten pounds frequently, but who would need to avoid overhead reaching, pushing, and pulling, as well as postural activities.  The expert explained that an individual with those limitations could perform unskilled, light work, including work as a toll collector, fast-food worker, courier, unarmed security guard, rental clerk in a self-service storage facility, furniture rental clerk, and construction flagger.  He also listed work as a charge account clerk, which is classified as sedentary and unskilled, as an available option.  The expert explained that "the listing requirements of the jobs identified, with the exception of the charge account clerk, could be carried out with the non-dominant arm."  (Id. at 12.)

Lalime's attorney then asked the expert what positions would be available to an individual with the same background explained in the ALJ's hypothetical, but with the additional restriction that lifting not exceed five pounds.  The expert eliminated some of the previously listed jobs, but maintained that the charge account clerk and construction flagger would not require lifting in excess of five pounds. (Id. at 13.)  He also noted that much

of the work involved in toll collection could be done using the upper left extremity, and while the job also required carrying a coin tray, the job generally would not require any overhead lifting.  (Id.)

On September 28, 2007, the ALJ issued his decision and determined that because Lalime had always retained the RFC to perform several jobs available in the national economy, she was not disabled at any time through the date of decision.  (Id. at 1-2.)  The parties agree that in determining whether Lalime was disabled, the ALJ followed the sequential evaluation process, as required by 20 C.F.R. § 404.1520.  (Id. at 13.)  The ALJ first determined that Lalime had not engaged in any substantial gainful activity since her alleged onset date.  Next, the ALJ ruled that Lalime's impairments, namely, her rotator cuff tear and obesity, did not meet the criteria of the listed impairments in the federal guidelines.  The ALJ then assessed Lalime's RFC.  The ALJ evaluated Lalime's complaints, and, although he found them to be credible, he did not think Lalime's injuries precluded light work.  (Id. at 14.)  The full range of jobs available, however, was significantly reduced by her limitations, and the ALJ found Lalime unable to perform her past relevant work.  After considering Lalime's age, education, work experience, RFC, and testimony from the vocational expert, the ALJ determined that Lalime could perform other work in the economy.  Finally, the ALJ

concluded that at no time through the date of decision was Lalime disabled.  (Id. at 14-15.)  Lalime requested review of the ALJ's decision, but the Appeals Council denied her request on March 14, 2008, thus rendering the ALJ's ruling the final decision of the Commissioner.

## II.  **STANDARD OF REVIEW**

Pursuant to 42 U.S.C. § 405(g) a district court, following a timely request, may review the administrative record and "enter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a hearing."  However, the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g). It is also solely within the purview of the Commissioner to make determinations as to "credibility and to draw inferences from the record evidence."  Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991).  Accordingly, in reviewing the record for substantial evidence, a district court may not reweigh the evidence or substitute its own judgment for that of the Commissioner's.[9]  Id.

---

[9]  Substantial evidence is "more than a mere scintilla" of evidence; it "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Currier v. Sec'y of Health, Educ. & Welfare, 612 F.2d 594, 597 (1st Cir. 1980)(quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

The reviewing court is not bound to the Commissioner's findings in all instances.  Where the Commissioner has committed some legal or factual error in his evaluation of the disability claim, deference will not be appropriate.  See Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996). Further, the ALJ's findings of fact will not be conclusive when they are "derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (citation omitted).


### III.  ANALYSIS

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  In order to determine whether a claimant has a disability resulting from a physical or medical impairment, the ALJ conducts a five-step sequential analysis.  20 C.F.R. § 404.1520(a).  The claimant has the burden at each of the first four steps to show that: (1) the claimant is not engaged in substantial gainful activity; (2) the claimant has a severe impairment; and (3) the impairment meets or equals a specific impairment listed in the SSA regulations; or (4) the

impairment prevents or prevented the claimant from performing past relevant work.  Id.  At step five, the burden shifts to the Commissioner to show "that there are jobs in the national economy that [the] claimant can perform."  Heggarty v. Sullivan, 947 F.2d 990, 995 (1st Cir. 1991).  The ALJ's conclusions at steps four and five are informed by his assessment of the claimant's RFC, which is a description of the kind of work that the claimant is able to perform despite her impairments.  20 C.F.R. §§ 404.1520, 404.1545.

The ALJ found that Lalime was not disabled at the fifth step of the sequential analysis.  He determined that Lalime had "the residual functional capacity to perform basic work activities but can only lift 20 pounds maximum, needs to avoid overhead reaching with the right arm, cannot push or pull with the right arm and cannot climb ladders."  (Tr. at 63.)

Lalime argues that (1) the ALJ did not properly assess the treating physician's opinion; (2) the ALJ committed reversible error by relying solely upon the agency physician's report in assessing Lalime's RFC; and (3-4) the ALJ failed to properly evaluate Lalime's non-exertional limitations and her credibility. Below, I address each of these arguments in turn.

## A.   The ALJ's Consideration of Treating Physician's Opinion

Lalime contends that in finding Dr. Mitchell's assessment of Lalime's lifting capacity to be not credible, the ALJ gave

inadequate weight to the treating physician's medical opinion.
(Pl.'s Mot., Doc. No. 6-2, at 5.)   The government argues that the
ALJ's ruling that Lalime was not disabled was based on careful
consideration of all the evidence in the record, including both
the evidence from Dr. Mitchell and Lalime's own statements about
her condition.   (Def.'s Mot., Doc. No. 8-2, at 1-2.)

     When making disability decisions, ALJs are required to give
a treating physician's opinion "controlling weight" if it is
"well-supported by medically acceptable clinical and laboratory
diagnostic techniques and is not inconsistent with other
substantial evidence" in the record.   20 C.F.R. § 404.1527(d)(2).
In Lalime's case, the ALJ did not think that Dr. Mitchell's
recommendation that the patient refrain from lifting in excess of
five pounds was supported by the record evidence.   The ALJ's
decision references Lalime's medical history and notes Lalime's
subjective complaints, namely that "she is able to lift more than
five pounds on occasion – up to 20 pounds - but 'pays for it' the
next day."  (Tr. at 61.)   In the section addressing Lalime's RFC,
the ALJ reviewed agency physician Dr. Fairley's assessment that
Lalime "could lift and/or carry 20 pounds occasionally and 10
pounds frequently . . . [but] needs to avoid reaching over the
shoulder with her right arm."  (Id.)  Dr. Fairley also imposed
additional restrictions, and in agreeing with Dr. Fairley's view,
the ALJ rejected Dr. Mitchell's assessment that Lalime was

-13-

permanently unable to life more than five pounds.  The ALJ also considered Lalime's testimony about her own abilities, namely that "she was able to lift 20 pounds from a strength point of view."  (Id.)  Thus, the ALJ determined that not all of the evidence in the record was consistent with Dr. Mitchell's opinion, and the opinion was not given controlling weight.

When a treating physician's opinion is not given controlling weight, the ALJ is next required to determine the appropriate level of weight that it should be given.  Factors to consider include the length of the treatment relationship and frequency of examination; the nature and extent of the relationship; the extent to which the evidence, and the physician's explanation of that evidence, supports the opinion; the consistency of the opinion in the context of the record as a whole; whether the treating physician is a specialist in the field; and any other factors that tend to support or contradict the opinion.  20 C.F.R. § 404.1527(d)(2)-(6).  The factors are, no doubt, malleable, but ALJs are required to "always give good reasons" explaining the weight given to a particular physician's opinion. Id. § 404.1527(d)(2).

In his written decision, the ALJ referenced Lalime's history of problems with her right shoulder, including her own assessment of her situation.  Based on his consideration of the record, the ALJ decided that Lalime had light duty capacity "to perform basic

work activities," but that she could only lift up to twenty
pounds, she should avoid overhead reaching, as well as pushing
and pulling, with her right arm, and that she is not able to
climb ladders.  (Tr. at 62.)  Thus, while the ALJ disregarded Dr.
Mitchell's assessment as to Lalime's lifting capacity, he adopted
his conclusions with respect to the reaching, pushing, and
pulling restrictions.  Although the ALJ's decision does not
methodically apply the aforementioned factors when determining
the amount of weigh to give to Dr. Mitchell's opinion, the ALJ
does explain that the medical opinions "have been assessed under
the appropriate regulatory criteria in assigning weights to be
given in the decision-making process (see 20 C.F.R. 404.1527)."
(Id. at 59.)  The ALJ's decision sufficiently makes clear that
the factors were considered.  For example, the decision
explicitly references several of the visits that Lalime made to
Dr. Mitchell, as well as the operations Dr. Mitchell performed.
The ALJ did not use the prescribed language of 20 C.F.R. §
404.1527, but did devote four paragraphs of the decision to a
discussion of the treating physician's history with the patient.
Thus, Dr. Mitchell's opinion was noted, and to the extent that
the ALJ found it in conformity with the record evidence, it was
adopted.

     Finally, Lalime argues that the ALJ was required to
recontact Dr. Mitchell "to clarify the reasons for his opinion

concerning the claimant's lifting and other physical restrictions."  (Pl.'s Mot. Doc. No. 6-2, at 6.)  Lalime here refers to Social Security Ruling 96-5p, but that instruction only requires an inquiry "where there is both a lack of evidentiary basis for a treating source's opinion and an inability, on the part of the adjudicator, to ascertain the basis of the opinion." Bruso v. Barnhart, 2005 WL 1528765, at *9 (D.N.H. June 29, 2005); see Conte v. McMahon, 472 F. Supp. 2d 39, 49 (D. Mass. 2007) ("a duty exists to re-contact a medical source if the information provided is inadequate to address the question of disability"). There is nothing in the ALJ's decision that suggests he did not understand the factual foundation for Dr. Mitchell's opinion; rather, it is apparent that he made a "credibility decision" that found Dr. Fairley's opinion more consistent with the evidence in the record as a whole.  See Conte, 472 F. Supp. 2d at 49.  Under those circumstances, there was no duty to re-contact Dr. Mitchell to obtain more information.

### B.  Determining Lalime's Residual Functioning Capacity

Lalime next disputes the ALJ's determination of her RFC.  In particular, Lalime argues that he improperly relied solely on agency physician Fairley's report when making the RFC assessment, and that Dr. Fairley's opinion lacks adequate support.[10]  (Pl.'s

---

[10]  Lalime also argues that because Dr. Fairley examined her at a point at which her condition had not stabilized, Fairley's assessment should not have been given much weight. Dr. Fairley's

Mot., Doc. No. 6-2, at 6.)  The government contends that
substantial evidence supports the ALJ's ultimate determination
about Lalime's work capacity.

The ALJ considered evidence and testimony from Dr. Mitchell,
Dr. Fairley, and Lalime.  On March 20, 2007, Dr. Mitchell
permanently restricted Lalime from any tasks requiring repeated
reaching, pushing, pulling, or lifting in excess of five pounds.
Late, in August 2007, Dr. Mitchell noted that Lalime experienced
pain and limited function in her right arm, but he also reported:
"Cervical range of motion full.  Shoulder and arm motion full.
Good strength against resistive testing."  (Tr. at 312.)  He
offered no assessment of Lalime's left arm.  His opinion was
different from the one put forth by Dr. Fairley, who on May 30,
2006, "opined that Plaintiff could lift 20 pounds occasionally,
lift 10 pounds frequently, stand and/or walk for about six hours
in an eight-hour workday, and sit for a total of about six hours
in an eight-hour workday."  (Joint Statement of Facts, Doc. No.
9, at 6.)  The ALJ noted Lalime's testimony that she could sit,
stand, or walk for six hours, and "lift 20 pounds from a strength
point of view."  (Tr. at 61.)  Specifically, Lalime testified at
her hearing that she would rely on her left hand when reaching

---

examination of Lalime took place less than two months after her
second surgery, and, at that time, she was undergoing post-
surgical physical therapy.  Other than repeatedly restating this
proposition in her brief, Lalime does little to advance an
argument as to why this is relevant.

over her head to get dressed or comb her hair.  (Id. at 38.)  She further stated that she could potentially lift or carry twenty pounds occasionally, but that she might "feel it" the following day, and claimed that she could not repetitiously lift ten pounds.  (Id. at 43.)  Thus, she felt it best to stick to Dr. Mitchell's recommendation that she avoid lifting more than five pounds.  (Id. at 42.)

After considering this evidence, the ALJ found both Dr. Fairley's opinion and Lalime's own descriptions of her daily activities to be "consistent with the ability to lift or carry more" than five pounds.  (Id. at 61.)  Although Lalime stated that lifting up to twenty pounds might result in pain shortly thereafter, she did not deny that she could potentially have the strength to do it.  The government argues that this evidence, coupled with evidence of Lalime's daily schedule - which includes activities like vacuuming her home, washing dishes, and doing light shopping – does not support a finding that Lalime suffers from a disabling impairment.

The ALJ did not simply adopt Dr. Fairley's view without qualification.  Although the ALJ's decision as to Lalime's RFC was consistent with Dr. Fairley's view, it was also a result of the ALJ's review of the record evidence, including Lalime's own testimony.  Moreover, rather than completely disregard Dr. Mitchell's opinion, the ALJ incorporated his recommendation that

-18-

Lalime not engage in repetitive pushing and pulling and avoid
overhead reaching.  Thus, after considering the record as a
whole, the ALJ determined that while some of Dr. Mitchell's
recommendations were consistent with the evidence, others were
not.  As the ALJ's decision demonstrates, those unsupported
opinions were given less weight to the extent they were refuted
by evidence of Lalime's daily activities.  See Johnson v.
Barnhart, 2005 WL 1414406, at *2 (11th Cir. June 17, 2005) (an
adjudicator need not give the treating physician's opinion
substantial weight when the evidence supports a contrary
finding).  Considering what was before him in the record, the
ALJ's decision with respect to Lalime's RFC was supported by
substantial evidence.  After factoring in Lalime's pulling and
pushing limitations with her right arm, as well as her inability
to climb ladders, the ALJ determined that Lalime could perform a
number of the "light jobs that could be done with the nondominant
arm."[11]

        Lalime also contends that Dr. Fairley's opinion is not
adequately supported.  He examined Lalime, and made an assessment

---

        [11]  Some of the light jobs that the vocational expert
identified would not require Lalime to lift over five pounds.
Even if one accepts that Lalime's RFC should have had a lifting
restriction of no more than five pounds, she still would have
been able to perform some of the tasks identified by the
vocational expert, namely, charge account clerk, construction
flagger, and possibly toll collector.  (Joint Statement of Facts,
Doc. No. 9, at 13.)

of her condition on May 30, 2006.  It is not clear what more
Lalime would have had the agency physician do.  Of course, Dr.
Fairley's assessment was made more than a year prior to the ALJ's
decision, but the ALJ also considered Lalime's condition after
that date.  In particular, he noted Lalime's own testimony from
August 2007 and Dr. Mitchell's contrary opinion from May 2007.
Lalime also makes much of the fact that Fairley noted that Lalime
is a "poor candidate for resuming heavy tasks with labor," and
yet, opined in the same assessment that she "is seen to have
retained a light work capacity throughout."  (Tr. at 192.)  It is
not clear how this is necessarily contradictory.

### C.  <u>Consideration of Lalime's Nonextertional Limitations</u>

Lalime claims that the ALJ failed to consider her other
limitations, namely her ability to use only her nondominant arm,
her obesity, her inability to sleep, and the pain she suffered.
The ALJ's written decision, however, suggests otherwise.  The ALJ
accepted that Lalime had restrictions on the use of her right
arm, particularly with respect to pushing and pulling.  As a
result, with the exception of one position, all of the jobs
referred to by the vocational expert "generally can be carried
out with the non-dominant arm."  (Tr. at 48.)  Thus, the ALJ
considered, and appropriately accommodated, that limitation.

Lalime also argues that the ALJ should have assessed the
limitations that resulted from her obesity.  Obesity is

considered "severe" when "alone or in combination with another
medically determinable physical or mental impairment(s), it
significantly limits an individual's physical or mental ability
to do basic work activities." SSR No. 02-1p. There is no
listing for obesity, unless it "is of such a level that it
results in an inability to ambulate effectively," and so usually,
an obese petitioner meets "the requirements of a listing if he or
she has another impairment that, by itself . . . or in
combination with obesity, meets the requirements of a listing."
Id. An ALJ's assessment of a petitioner's functioning ability
must consider the extent to which one's obesity might impact "an
individual's maximum remaining ability to do sustained work in an
ordinary work setting on a regular and continuing basis." Id.
While it is sometimes difficult to discern the level of
consideration an ALJ gave to a particular factor when making a
disability decision, the adjudicators's reference to that factor,
when considered in light of the opinion as a whole, is an
indication. Brown v. Barnhart, 388 F.3d 1150, 1153 (8th Cir.
2004).

Here, the ALJ adequately considered Lalime's obesity when
assessing her RFC. The ALJ's decision notes that Lalime is obese
and that the resulting effects of that condition "are considered
in combination with her upper extremity impairment." (Tr. at
61.) In addition, the ALJ restricted Lalime from climbing

ladders.  Lalime has not identified any other evidence in the
record that suggests her obesity would somehow render her
incapable of performing the prescribed work of lifting no more
than twenty pounds without pushing or pulling.  Nor did Lalime
testify to any particular limitations specifically attributable
to her obesity.  Given the ALJ's references, more than once, to
Lalime's obesity, it is clear that he considered that condition
when evaluating her claim.  See Brown, 388 F.3d at 1153.  In
accordance with regulatory requirements, he also explained that
the obesity and rotator cuff injury do not amount "to an
impairment or combination of impairments listed in or medically
equivalent to one listed in Appendix No. 1, Subpart P,
Regulations No. 4."  (Tr. at 62.)  Absent any references from
Lalime as to what limitations resulted from her obesity, her
claim that the ALJ failed to properly consider such limitations
is rejected.  See Senay v. Astrue, 2009 WL 229953, at *13 (D.R.I.
Jan. 30, 2009).

Lalime has failed to show how her alleged sleeping issues
would have any vocational impact.  She testified that although
pain in her arm makes sleeping difficult some nights, on average
she gets six hours of sleep a night.  Lalime argues that the ALJ
should have analyzed the impact that her "difficulty sleeping"
would have had on her ability to perform gainful employment;
however, it is not clear from the record what impact, if any,

getting six hours of sleep a night might have on one's ability to perform work.

Lalime's final challenge is that the ALJ should have evaluated her subjective testimony about the pain she suffered as a result of her shoulder injury.  The U.S. Court of Appeals for the First Circuit has directed that in evaluating a claimant's subjective complaints of pain and other symptoms, the ALJ should consider a variety of factors (sometimes known as the <u>Avery</u> factors) including "(1) [t]he nature, location, onset, duration, frequency, radiation, and intensity of any pain; (2) [p]recipitating and aggravating factors (e.g., movement, activity, environmental conditions); (3) [t]ype, dosage, effectiveness, and adverse side-effects of any pain medication; (4) [t]reatment, other than medication, for relief of pain; (5) [f]unctional restrictions; and (6) [t]he claimant's daily activities."  <u>Avery v. Sec'y of Health & Human Servs.</u>, 797 F.2d 19, 28-29 (1st Cir. 1986).  The ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."  SSR No. 96-7p.

Detailed written discussion of the <u>Avery</u> factors is desirable, <u>see</u> <u>Frustaglia v. Sec'y of Health and Human Servs.</u>,

829 F.2d 192, 195 (1st Cir. 1987), but an ALJ complies with <u>Avery</u> if he examines the relevant factors at the administrative hearing, <u>see</u> <u>Graham v. Barnhart</u>, 2006 WL 1236837, at *8 (D.N.H. 2006); <u>see also</u> <u>Braley v. Barnhart</u>, 2005 WL 1353371, at *4 (D. Me. June 7, 2005) (an ALJ is not required to "slavishly discuss each <u>Avery</u> factor").  Here, Lalime's attorney and the ALJ asked Lalime questions implicating several of the relevant <u>Avery</u> factors at the hearing.  Lalime was asked about the onset of her pain and injury, as well as the nature of her pain and what kinds of activity exacerbate it.  (Tr. at 27, 37, 39-42.)  She was asked, and provided extensive commentary, about her daily activities.  (<u>Id.</u> at 35-40.)  Lalime also explained her ability to lift different weights, and explained the way in which her body would react to lifting those various amounts.  (<u>Id.</u> at 43.) Finally, Lalime testified about the medications she was taking for her pain.  (<u>Id.</u> at 30, 35.)

The ALJ found her complaints about her pain to be "generally credible but not to the extent that light jobs would be precluded." (<u>Id.</u> at 63.)  He reached this conclusion after taking notice of Lalime's daily activities, which included preparing meals, doing laundry, walking, washing dishes, and vacuuming.  Given the level of exertion required to perform these tasks, as well as the restrictions the ALJ imposed on Lalime's RFC, there is substantial evidence in the record to support the

-24-

ALJ's decision about the appropriate weight to give to Lalime's subjective complaints of pain.

### D.  Assessment of Lalime's Credibility

Lalime's final challenge is that the ALJ failed to properly assess her credibility with respect to both her claims about her physical capacity and in general.  Assessment of the claimant's credibility is the exclusive province of the ALJ, who observes the claimant, evaluates her demeanor, and considers how her testimony "fit[s] in with the rest of the evidence."  Frustaglia, 829 F.2d at 195.  The ALJ's credibility determination is entitled to deference if it is supported by substantial evidence.  Id.  In determining the credibility of a claimant's subjective testimony, the ALJ must consider the entire record, including objective medical evidence, the claimant's statements, information provided by physicians and other people, and any other relevant evidence. SSR No. 96-7p.

There is substantial evidence to support the ALJ's determination that Lalime's limitations were not disabling.  The ALJ's decision appropriately examines Lalime's testimony about her pain and limitations, her daily routine, and the medical evidence.  The nature of Lalime's injuries and their impact on her life, the types of activities that exacerbate her problems, the treatment she has undergone, and the way in which she copes with her limitations on a daily basis are all considered in the

decision.  See Avery, 797 F.2d at 28-29; see also 20 C.F.R. §
404.1529.  Lalime testified that she carries one or two bags of
groceries herself, does laundry, cleans her home, is able to lift
a gallon of milk, and carry out other daily tasks without pain or
problem.  (Tr. at 38-40.)  It is hard to see how one who is able
to carry out these tasks is crippled by disabling limitations.

When asked about her ability to lift weights of ten pounds,
Lalime testified that she could not do so "repetitiously."  (Id.
at 43.)  With respect to weights of twenty pounds, she testified
that "I could do it today but because I might feel it tomorrow I
probably couldn't tomorrow."  (Id.)  In the ALJ's decision, he
wrote that he found this testimony "generally credible insofar as
[Lalime] testified she was not able to perform light work
exertionally."  The decision goes on to note that Lalime
testified that "she is able to sit, stand or walk six hours in a
workday and, further, that she is able to lift 20 pounds from a
strength point of view."  (Id. at 61.)  Taking this into account,
the ALJ noted that Lalime would not be precluded from performing
light work, which "only requires lifting 20 pounds on an
occasional basis and lifting 10 pounds on a more frequent basis."
(Id.)  Moreover, the jobs that the vocational expert identified
for someone with Lalime's limitations "could be done with the
nondominant arm."  (Id. at 62.)  Thus, the ALJ fairly considered
Lalime's limitations, as both she and the medical record

-26-

articulated them, and determined a RFC that fairly took those restrictions into account.

### IV.   **CONCLUSION**

For the reasons set forth above, Lalime's Motion for Order Reversing Decision of the Commissioner (Doc. No. 6) is denied and defendant's Motion for Order Affirming the Decision of the Commissioner (Doc. No. 8) is granted.  The clerk shall enter judgment accordingly and close the case.

SO ORDERED.


/s/Paul Barbadoro
Paul Barbadoro
United States District Judge

April 13, 2009

cc:  Seth R. Aframe, AUSA
     Darlene M. Daniels, Esq.